UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 1:23CR95 |
| DAMETRIS SAMUELS, | : | Judge Black |
| Defendant. | : | |

**SENTENCING MEMORANDUM**

Now comes the defendant Dametris Samuels, by and through counsel, and hereby submits this sentencing memorandum for the Court's consideration. Mr. Samuels respectfully submits that a sentence of 24 months of imprisonment followed by three years of supervised release is "sufficient but not greater than necessary" within the meaning of 18 U.S.C. 3553(a). Such a sentence would account for (1) the serious nature of the offense; (2) Mr. Samuel's history and characteristics; (3) the recent Guideline amendments that effect a basis for a departure/variance from the guideline range of 37-46 months; and (4) the sentences of similar defendants who have committed the same crime in related cases in the Southern District of Ohio.

**Background.**

On January 31, 2024, Dametris Samuels pleaded guilty to conspiracy to commit mail theft in violation of 18 U.S.C. 371. (PSR ¶ 4). He, along with others in this district, stole mail containing checks from USPS "blue boxes" (i.e., postal collection boxes) for the purpose of altering them and depositing them at banks. On June 10, 2024, Mr. Samuels will be sentenced by this Court for conspiring to commit this theft. Pursuant to the terms of the plea agreement, the Court may impose any sentence up to and below 44 months. The government recommends a sentence of 40 months,

1

but for reasons below, a sentence of 40 months is greater than necessary and thus in contravention of 18 U.S.C. 3553.

**Legal Standard.**

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." United States v. Demma, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall v. United States, 552 U.S. 38, 49 (2007). However, the range is merely one factor to consider when imposing a sentence. *Id*. at 59 ( "3553(a)(3) directs the judge to consider sentences other than imprisonment"); see also, Pepper v. United States, 562 U.S. 241, 247 ("Consistent with the principle that the punishment should fit the offender and not merely the crime…a sentencing judge should exercise wide discretion in the sources and types of evidence used to assist him in determining *the kind and extent* of punishment to be imposed within limits fixed by law, particularly the fullest information possible concerning the defendant's life and characteristics")(internal citations omitted, emphasis supplied); Nelson v. United States, 129 S.Ct. 890, 892 (2009)(district courts may not presume that a sentence imposed within a correctly calculated guideline range is "reasonable").

Rather than reflexively imposing a guideline-range sentence, the Court is to engage with the factors enumerated in 18 U.S.C. § 3553(a) in order to craft a sentence that is sufficient but not greater than necessary to effect the purposes of sentencing set forth by Congress therein. A balancing of those factors supports the requested sentence of 24 months of imprisonment followed by three years of supervised release under the circumstances here.

**Guideline Calculation.**

The Probation Office has calculated an advisory guideline range of 37-46 months, based on an offense level of 21 and a criminal history category of I. The parties agree with Probation's guideline computation and submit that 37-46 is the correct starting point in the Court's analysis of the sentencing factors contained in 18 U.S.C. 3553(a). A downward departure/variance from the range of 37-46 months is warranted based on recent amendments to the Guidelines, Mr. Samuels' history and characteristics, and the need to avoid unwarranted sentencing disparities among similarly situated individuals who have committed the same crime, in the same time frame, in the same district.

**Relevant Guideline Amendments.**

The Probation Office has identified Guideline Amendment 821(B) as a potential ground for a departure to a range of 30-37 months. As noted in paragraphs 108-110 of the presentence report, Mr. Samuels' one and only criminal history point stems from a conviction for possession of marijuana. U.S.S.G. 4A1.3 was recently amended to underscore that a criminal history designation is overstated when that designation is based on one or more criminal history points resulting from "a sentence for possession of marijuana for personal use, without an intent to sell or distribute it to another person." (PSR ¶ 109).

Here, but for the one criminal history point assigned to Mr. Samuels in paragraph 53 of the presentence report for possessing marijuana, Mr. Samuels would qualify as a zero-point offender. As the Court knows, the Sentencing Commission implemented Amendment 821(B) to the offense level computation as it pertains to "zero-point offenders." This Amendment created a new Chapter Four guideline at §4C1.1 (Adjustment for Certain Zero-Point Offenders) and provides a decrease of two levels from the offense level determined under Chapters Two and Three for offenders who

3

did not receive any criminal history points under Chapter Four and whose instant offense—like Dametris Samuels'—did not involve specified aggravating factors.

In establishing this new §4C1.1 guideline, the Commission was informed by its studies of recidivism among federal offenders, as well as other extensive data analyses of offenders with no *countable* criminal history points, and public comment. Recidivism data analyzed by the Commission shows that offenders like Mr. Samuels with zero criminal history points have considerably lower recidivism rates than other offenders. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/researchreports/recidivism-federal-offenders-released-2010. Among other findings, the report concluded that "zero-point offenders" were less likely to be rearrested than "one point" offenders (26.8% compared to 42.3%), the largest variation of any comparison of offenders within the same Criminal History Category.

In light of the Guideline's amendment pertaining to marijuana convictions and criminal history designations, Mr. Samuels respectfully requests that the Court treat him as a "Zero-Point Offender." As noted in the presentence report, the Court has the discretion to depart/vary on this basis, and should it choose to do so, Mr. Samuels' offense level would be lowered from 21 to a level 19, which results in a range of 30-37 as the starting point in the Court's sentencing analysis.

**Mr. Samuels' offense conduct in the context of his history and characteristics.**

Mr. Samuels understands and acknowledges the serious nature of his criminal offense and makes no excuses for his conduct. Indeed, he has written a letter to the Court and to his family, expressing his deep remorse, not for getting caught but for having caused harm to the community and pain to his family and for the work he has caused the government and this Court. See Ex. 1, Samuels Ltr. He fully owns the decision he made to get involved in the instant offense, but he has

4

already begun the process of introspection and self-analysis needed to grow from the learnings of this prosecution, from the weight of that decision. As he notes, Mr. Samuels has never been to prison before and has a minimal record, but rather than sink into a hole of shame where his self-worth and self-identity become warped such that he sees himself only as a criminal, now and forever, he is engaging in ongoing self-help work so that he resists that destructive impulse and will be able to hold true to the promise he makes this Court: that he will take the worst decision he has made in his young and challenging life and ensure that the lessons he has learned will keep him focused on a productive, law-abiding life.

The government says in its memo that a picture is worth 1,000 words, as it describes the picture taken of the checks at issue in this case. And of course the government's truism is correct. But it's a particularly painful turn of phrase to use in relation to Mr. Samuels, because there are no pictures that can tell the fuller tale of Mr. Samuels' life. Instead, his birth to an alcoholic, negligent mother was the beginning of a peripatetic life, where Mr. Samuels was marked at an early age as simply being bad, never getting the safe nurturing he needed. Unable to handle the "bad" child, left as she was having to care for grandchildren whose father was in and out of jail for drug possession and whose mother was unable or unwilling to work to provide for her children financially or care for them emotionally, Mr. Samuels' grandmother abandoned him to the state when he was thirteen. Too old for group homes, and unwelcomed by family, Mr. Samuels lived for two years at the Talbert House, despite that he was too young for that foster program, which is designed to help kids transition from teen (16) to adult (21).

Mr. Samuels, of course, was not bad then, any more than he is bad now. He was a child who suffered from persistent neglect, unloved by his mother, and desperate for some care and attention. Neglect, of course, delays brain development and impairs executive functioning, which

5

in someone like Mr. Samuels, with ADHD, is already impaired.[1] Executive functioning is critical to impulse control, thoughtful decision-making, and stress management, so neglect exacts particular and lasting harm when it is persistent in the early childhood years as it was for Mr. Samuels.

So, it is not surprising that Mr. Samuels internalized the message he heard everywhere, that he was bad. It is not surprising that at age 11 he was already interfacing with the juvenile justice system. But as so often happens, the steps taken to deal with the chaos Mr. Samuels created in response to the neglect responded to the symptoms and did not address the cause. And, as noted by those who study the effects of neglect, one of the two most common misconceptions about neglect is that removing a child from a neglectful setting will produce positive outcomes.[2] Instead of further abandonment (like to strangers in an ill-suited institutional setting), what neglected children need is focused attention and targeted interventions like therapy, something Mr. Samuels has never received.

As a child and teen, Mr. Samuels groped for the coping mechanisms he could find, as he did not have stable, nurturing, available parents to guide him. And what he found was "the wrong crowd," drugs and alcohol, the instant offense. But he also, despite those other forces, found the wherewithal to become a graduate of the Lighthouse Community School, a charter school operated collaboratively between Lighthouse Youth Services and Cincinnati Public Schools, helping at-risk

---

[1] *See, e.g.*, National Scientific Council on the Developing Child (2012). *The Science of Neglect: The Persistent Absence of Responsive Care Disrupts the Developing Brain: Working Paper No. 12*, available at https://developingchild.harvard.edu/resources/the-science-of-neglect-the-persistent-absence-of-responsive-care-disrupts-the-developing-brain/.

[2] *See* Chiamulera, Claire (2013). Understanding Neglect's Toll on Child Development, *available at* https://www.americanbar.org/groups/public_interest/child_law/resources/child_law_practiceonline/child_law_practice/vol_32/march_2013/understanding_neglectstollonchilddevelopment/.

kids like Mr. Samuels stay connected to education. And he did stay connected, despite having been removed from his family, despite not having positive peer supports; he graduated. And he wants to do more—he wants to continue on his path of self-improvement, he wants to finally receive the substance use and mental health counseling he desperately needs and has never been offered. He wants to finally let go of this "bad child" trauma and actualize the message he has inked on his arm: The future belongs to those who believe in the beauty of their dreams. (PSR ¶ 75). Mr. Samuels is not bad: He is a kind, loving brother, son, and grandson who has struggled alone to overcome the traumas of his past. He knows that he needs to carve a new path for himself, so that he can believe his beautiful dreams, and he has already demonstrated his commitment to that path.

The Court must factor in Mr. Samuels' history and characteristics in fashioning a sentence, and the requested sentence of 24-months of imprisonment reflects such consideration.

### **Avoiding Unwarranted Sentencing Disparity.**

Lastly, 18 U.S.C. § 3553(a)(6) requires sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" as well as the need to avoid unwarranted sentencing similarities among defendants who are not similarly situated. Gall, 552 at 53. In order to do so, "district courts must take account of sentencing practices in other courts." Kimbrough v. United States, 552 U.S. 85, 108 (2007).

While 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct, this Court may (and should) exercise its discretion and determine Mr. Samuels' sentence in light of the recent, related intra-district mail theft cases. United States v. Presley, 547 F.3d 625, 631-32 (6th Cir. 2008)(courts have

7

the discretion to impose a sentence that avoids unwarranted disparity among intra-district defendants).

Mr. Samuels' request for a sentence of 24 months followed by three years of supervised release would not create unwarranted sentencing disparity. The chart below of defendants convicted of mail theft, within the same time frame, in the same district underscores this point.

| Defendant | Judge | Facts | Actual Loss | Sentence |
|---|---|---|---|---|
| Keith Calahan 3:22CR148 | Rice | Attempted to flee. 250 stolen checks found in his apartment along with firearms | $48.55 | 18 months |
| Jayon Perrin 3:23CR80 | Rice | Over 500 checks, arrow key, USPO service logo jacket and a "veritable fraud factory" found in apartment | Restitution tbd | 32 months |
| Larry Lucas 1:23CR32 | Dlott | Employee of post office facilitated theft from mail bins | $154,814.00 | probation |
| Sjaron Burns 1:23CR32 | Dlott | Theft of mail deposits while pretending to be a postal employee. Remanded at sentencing due to appearing before the Court under the influence of drugs. | $154,814.00 | 27 months |
| Arnondo Miller 1:23CR44 | Barrett | Stolen mail and checks with a face value of over $300,000. Arrow key in defendant's possession. Probation calculated guideline range 51-60 months | None | 28 months |
| William Lindsay 1:23CR44 | Barrett | Orchestrated and participated in the assault and robbery of a postal carrier for an arrow key. Agents recovered USPS mail bins, ammunition, and stolen mail and checks with a face value of $217,566.27. | None | 33 months |
| Derray Kennedy 1:23CR44 | Barrett | Hid a stolen USPS arrow key on the floor of the police cruiser. $242,807.82 intended loss. Criminal history category V. | None | 20 months |
| Lawrence Sherman | Dlott | Fled from police in extended car chase. "Brash and prolific in | $174,891.09 | 40 months |

8

| | | | | |
|---|---|---|---|---|
| 1:23CR13 | | his mail theft and bank fraud schemes." After obtaining first USPS arrow key, he bribed a USPS carrier to obtain a replacement arrow key. Over $500,000 intended loss. | | |
| Brandon McCollom 1:23CR13 | Dlott | Over $500,000 intended loss | $174,891.09 | 24 months |
| Demarco Tappler 1:23CR65 | Dlott | U.S. Postal Service employee who sold his USPS arrow key to a mail thief and discarded undelivered mail into the woods. | None | 4 months of community service, supervised release |

Each of the above cases supports the imposition of the sentence requested by Mr. Samuels. As the addendum to the presentence report states, Mr. Samuels caused no unrecovered actual financial loss. In addition, there is no evidence that Mr. Samuels robbed a postal carrier or stole the arrow key as, for example, William Lindsay (1:23CR44) did in order to enrich himself by at least a quarter of a million dollars, an aggravated violent offense for which Mr. Lindsay received a sentence of 33 months. Surely a sentence 7 months higher than what Mr. Lindsay received is greater than necessary under the circumstances here and would create an unwarranted disparity, and a sentence 9 months less than what Mr. Lindsay received is plainly justified by, among other things, Mr. Lindsay's more egregious conduct.

In sum, the imposition of a 24-month sentence followed by three years of supervision for Mr. Samuels would not depreciate the seriousness of his crime or undermine the government's prosecution, as it is completely consistent with sentences given to similarly situated defendants convicted of the same crime in this district. Moreover, the proposed three-year term of supervised release to follow his term of incarceration would place Mr. Samuels under scrutiny for a significant period of time. The Court would retain a full arsenal with which to punish Mr. Samuels should he

9

violate any conditions imposed by the Court and would ensure that Mr. Samuels participate in rehabilitation programming sponsored by this Court: therapy and medication, if needed, drug treatment, and vocational training and support.

## CONCLUSION

Wherefore, Mr. Samuels respectfully requests this Court's consideration of a sentence of 24 months followed by three years of supervised release based upon the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

*s/ Karen Savir*
Karen Savir (92002)
Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Tim Mangan, Assistant United States Attorney, via Electronic Case Filing, on this 7th day of June 2024.

*s/ Karen Savir*
Karen Savir